UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAYNE ARTHUR SEID,

                    Petitioner,

v.                                          CASE NO. 08-14198
                                            HONORABLE JOHN CORBETT O'MEARA
DEBRA SCUTT,

                    Respondent.

_____/

**OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION,
GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Pending before the Court is petitioner Wayne Arthur Seid's *pro se* amended

petition for the writ of habeas corpus under 28 U.S.C. § 2254.  The petition challenges

Petitioner's Macomb County convictions for first-degree murder and possession of a

firearm during the commission of a felony (felony firearm).  Petitioner alleges that he is

in custody in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments

to the United States Constitution.  More specifically, Petitioner contends that there was

insufficient evidence to support the jury's verdict, the prosecutor committed misconduct,

his trial attorney was ineffective, and he was denied a fair and impartial jury.  Having

reviewed the record, the Court concludes that the state court's adjudication of these

claims was objectively reasonable and that Petitioner is not entitled to the writ of habeas

corpus.  Accordingly, the habeas petition is denied.

## I. Background

### A. The Charges and Trial Testimony

Petitioner was charged with open (first- or second-degree) murder and felony firearm.  The charges arose from the fatal shooting of forty-two-year-old Randy Jordan at a residential motel in Fraser, Michigan on February 6, 2005.

#### 1. Prosecution Witnesses

Paul Szoke testified at Petitioner's trial that he lived in the room next door to Petitioner and that, on the night in question, he heard what he thought were gunshots about 2:30 a.m.  He believed that four shots were fired approximately ten seconds apart.  He heard two voices and laughter coming from Petitioner's room earlier in the night, but he did not hear any yelling, and nobody said, "Get that knife away," "I'm injured," or "Get out of here."

Detective Eric Myers was the first police officer to respond to the crime scene. Petitioner informed Detective Myers that he had a nightmare and could not believe he shot the victim.  Detective Myers found a shotgun enclosed in a plastic gun case with the clasps locked underneath the bed.  The gun was empty, but there were four shotgun shells lined up on a dresser; two had been fired and two had not been fired.  A third shell was found in a shoe.  There were no signs of a fight, and a folded knife located in the victim's pocket did not have any blood on it.  Nor did the knife appear to have been used recently.

Sergeant Michael Pettyes met Petitioner in the booking room at the Fraser Department of Public Safety on February 6, 2005.  Petitioner was talking to himself and

2

saying, "This must be a bad dream; I can't believe I just killed somebody.  I'll kill once and I'll kill again."  When another officer entered the room, Petitioner said in a cocky, arrogant manner, "I'm the guy that killed somebody. . . .   The guy got in my face. He . . . tried to choke me, so I shot him and I shot him and I shot him and I shot him again."

About five hours after the shooting, Dr. Michael Mattingly used sutures to treat a wound on Petitioner's ear.  Dr. Mattingly testified at trial that the wound could have been five hours old or up to a day old, and even though it could have been caused by a knife, it was not consistent with a downward plunging motion.  The injury might have been accidental or it could have been self-inflicted.

Forensic pathologist Daniel Spitz testified that the victim died of multiple gunshot wounds, one in the right flank and one in his back.  The gunshot wounds were inflicted at close range, and, because they involved major organs, which bled extensively, both wounds were fatal.  Dr. Spitz thought that the most likely scenario was that the wound to the back occurred first.

A forensic scientist for the Michigan State Police testified that she did not detect the presence of blood on the knife in evidence.  Another forensic scientist testified that the blood on the victim's shirt and jeans and on a bed sheet and pillow case was not Petitioner's blood.  The parties stipulated that the trial court had ordered the Michigan State Crime Laboratory to examine Petitioner's clothing to determine the source of blood on the clothing and that the laboratory did not test the clothing.  The attorneys agreed that the results of the testing would have revealed Petitioner's blood on the clothing.

### 2.  Defense Witnesses and Rebuttal Witnesses

3

Petitioner testified that he met Randy Jordan about three or four weeks before the shooting.  He claimed that, on the night in question, he and Jordan watched television and consumed alcohol in Petitioner's room until 2:30 a.m. when he tapped Jordan on the leg and suggested that he leave for the night.  Jordan reacted by pinning Petitioner to the bed, choking him with his forearm, and pushing a knife through Petitioner's ear.  As Jordan moved the blade of the knife down toward Petitioner's waist, Petitioner threw Jordan off him, grabbed the gun from under his bed, and fired the gun while lying on the floor on his back.  He did not see Jordan when he fired the gun, and although he thought that he fired the gun only one time, he later learned that he had fired it three times.  He got up, saw Jordan's body, and immediately called the 911 operator.  He was instructed him to place the shells on the desk, leave the breach of the gun open, and put the gun back in the case under the bed.  The police arrived and took him into custody.  On the way to the police station, an officer told him not to say anything.

Petitioner admitted that he shot and killed Randy Jordan.  He claimed, however, that he grabbed the gun, because he thought Jordan intended to stab him again. Petitioner also claimed that the blood on his shirt sleeve and on the paper towel in evidence came from his ear.

Steven Howard, a firearms and ballistics expert, testified that the results of his tests were consistent with Petitioner's testimony that he was lying on his back on the floor when he fired the gun.  Mr. Howard thought that the first gunshot hit the victim's back, the second gunshot hit the victim's side, and the third gunshot hit a closet door. The prosecution presented two rebuttal witnesses, who testified that Randy Jordan was

4

a peaceful, non-violent person.

### B.  The Verdict, Sentence, and Appeal

On November 17, 2005, a Macomb County Circuit Court jury found Petitioner guilty of first-degree (premeditated) murder, MICH. COMP. LAWS § 750.316(1)(a), and felony firearm, MICH. COMP. LAWS § 750.227b.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction and to life imprisonment for the murder.

In an appeal of right, Petitioner argued that:  (1) the evidence was insufficient to support his murder conviction; (2) he was denied his right to remain silent by evidence of his post-arrest silence; (3) he was denied his right to present a defense by the prosecution's loss of potentially exculpatory evidence and counsel was ineffective for failing to request a hearing and an appropriate jury instruction; and (4) he was denied his right to a fair and impartial jury and effective assistance of counsel when a juror revealed that she knew the victim's family and no further inquiry was undertaken.  In a motion to remand his case to the trial court for an evidentiary hearing, Petitioner claimed that his trial attorney's omissions amounted to ineffective assistance of counsel.

On August 4, 2006, one member of a three-judge panel of the Michigan Court of Appeals voted to grant the motion to remand, but two members of the panel voted to deny Petitioner's motion.  On September 6, 2007, a different three-judge panel affirmed Petitioner's convictions in an unpublished *per curiam* opinion.  *See People v. Seid*, No. 267900, 2007 WL 2525707 (Mich. Ct. App. Sept. 6, 2007).  Then-Presiding Judge Helene N. White wrote in a concurring opinion that, although "the prosecutor crossed the line in questioning [Petitioner] regarding his silence and in arguing in that regard,

5

[she] nevertheless agree[d] that the outcome of the trial was not affected." *Seid*, 2007 WL 2525707, at *7.

On January 8, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Seid*, 480 Mich. 1009 (2008). The state supreme court denied reconsideration on March 24, 2008. *See People v. Seid*, 480 Mich. 1140 (2008).

### C. The Habeas Proceedings

On September 30, 2008, Petitioner filed a habeas petition, which set forth four claims: (1) prosecutorial misconduct; (2) ineffective assistance of trial counsel; (3) denial of the right to a fair and impartial jury; and (4) denial of the right to due process and a fair trial due to the cumulative effect of errors. Respondent moved to dismiss the petition on the ground that Petitioner had failed to exhaust state remedies for some of his sub-claims. The Court afforded Petitioner an opportunity to delete his unexhausted claims or to return to state court to further exhaust state remedies. Petitioner opted to delete the unexhausted claims. The remaining claims are:

I.    The evidence was insufficient to support the verdict of first degree premeditated murder and Petitioner's conviction is a denial of due process. U.S. Constitution Amendment XIV.

II.   The prosecutor's misconduct denied the petitioner a fair trial and due process of law in violation of Amendments V, VI, and XIV of the United States Constitution.

    A.    Improper cross-examination violating Mr. Seid's right to remain silent: *Doyle* violation.

    B.    Prosecutor's cross-examination of Defendant Mr. Seid.

    C.    Prosecution's improper closing arguments

6

    D.      Suppression of Evidence "*Brady* Violation"

III.    The petitioner received ineffective assistance of counsel at his trial in violation of Amendment VI, XIV of the United States Constitution.

    Trial counsel failed to:

    A.      call character witnesses on behalf of Mr. Seid;

    B.      request a hearing on missing and incomplete testing of evidence *"Brady* Material;"

    C.      request an instruction that missing evidence would be favorable to Mr. Seid;

    D.      obtain records of telephone calls made by Mr. Seid from his hotel room to substantiate his claim that he was told to place the gun in the case and the shells on the table;

    E.      call a corroborating witness for Mr. Seid's testimony that he was told not to say anything;

    F.      object to the prosecutor's closing argument

IV.    Petitioner was denied his right to a fair and impartial jury when the trial court abused its discretion by not allowing further inquiry after the first witness testified, and a juror revealed that he knew the victim's family.  This is a violation of due process Amendment VI, XIV.

The Court will proceed to address these claims on their merits using the following

standard of review.

## II.  Standard of Review

A habeas petitioner is entitled to the writ of habeas corpus only if the state court's

adjudication of his claims on the merits

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). To obtain a writ of habeas corpus from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law

8

beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## III. Discussion

### A. The Sufficiency of the Evidence

Petitioner alleges that the evidence at trial was insufficient to convict him of premeditated murder. According to Petitioner, there was no evidence of a motive or pre-conceived plan; instead, the evidence established that he was defending himself against a sudden attack in his own home. The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the prosecution presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Petitioner committed first-degree murder.

#### 1. Clearly Established Federal Law

The relevant question on review of a sufficiency-of-the-evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

In Michigan, the elements of premeditated murder are: (1) the defendant killed the victim and (2) the killing was "willful, deliberate, and premeditated." *People v. Bowman*, 254 Mich. App. 142, 151 (2002) (quoting Mich. Comp. Laws § 750.316(1)(a)). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329-30

9

(1971) (footnotes omitted).  Premeditation and deliberation may be inferred from all the circumstances, including "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide."  *People v. Schollaert*, 194 Mich. App. 158, 170 (1992).

"A pause between the initial homicidal intent and the ultimate act may, in the appropriate circumstances, be sufficient for premeditation and deliberation."  *People v. Plummer*, 229 Mich. App. 293, 301 (1998) (citing *People v. Tilley*, 405 Mich. App. 38, 45 (1979)).  "Although there is no specific time requirement, sufficient time must have elapsed to allow the defendant to take a 'second look.'"  *Id.* at 300 (citing *People v. DeLisle*, 202 Mich. App. 658, 660 (1993), and *People v. Anderson*, 209 Mich. App. 527, 537 (1995)).  A person is justified in using deadly force against another person if the person "honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm."  *People v. Heflin,* 434 Mich. 482, 502 (1990).

### 2.  Application

The record indicates that Petitioner became acquainted with Randy Jordan three or four weeks before the shooting.  There was nothing about their prior relationship to suggest that the murder was premeditated.  Nor was there anything about Petitioner's actions before the killing that suggest a premeditated killing.

The circumstances of the killing, however, tend to show that the killing was deliberate and premeditated.  The pathologist and Petitioner's own expert witness speculated that Jordan was shot first in the back and then on his side.  The gun was fired at close range and at ten-second intervals.  There was additional evidence that

10

Petitioner would have had to pump his shotgun before firing it.

Although Petitioner claimed that Jordan cut his ear and that he fired at Jordan because he thought Jordan intended to stab him a second time, evidence that Jordan was shot first in the back is consistent with self defense.  Furthermore, there was no blood on the knife, and the knife was found folded in Jordan's pocket.  In addition, Dr. Mattingly testified that Petitioner's injury was neither life-threatening, nor consistent with a downward stabbing motion.

Petitioner's conduct after the shooting also tended to support the prosecution's theory that the shooting was deliberate and premeditated.  Officers heard him say, "I'll kill once and I'll kill again," and "The guy got in my face.  He . . . tried to choke me, so I shot him and I shot him and I shot him and I shot him again."   (Tr. Nov. 10, 2005, at 81-82.)

Petitioner had sufficient time to take a second look at his actions before he shot and killed Randy Jordan, and there was inadequate support for his self-defense theory. A rational trier of fact therefore could have concluded from the evidence taken in the light most favorable to the prosecution that Petitioner premeditated and deliberated the killing.  The evidence was sufficient to support the jury's verdict.

Even if the Court had concluded that Petitioner's murder conviction was not supported by sufficient evidence, "the question would remain whether the [Michigan] Court of Appeals was unreasonable in concluding otherwise."  *Saxton v. Sheets,* 547 F.3d 597, 607 (6th Cir. 2008).  In making this determination, a federal habeas court must defer to the jury's verdict and to the state court's determination of whether the verdict was supported by sufficient evidence.  *Phillips v. Bradshaw*, 607 F.3d 199, 220

11

(6th Cir. 2010) (citing *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)), *cert. denied*, __ S. Ct. __, 2011 WL 767607 (U.S. Mar. 7, 2011).

The state court's conclusion – that the evidence was sufficient to sustain Petitioner's murder conviction – was objectively reasonable and neither contrary to, nor an unreasonable application of, *Jackson*.  It certainly was not so lacking in justification as to amount to an error beyond any possibility of fairminded disagreement. Accordingly, Petitioner is not entitled to relief on the basis of his challenge to the sufficiency of the evidence.

**B.  The Prosecutor's References to Petitioner's Silence**

Petitioner alleges that the prosecutor's references to his silence after the shooting deprived him of his constitutional rights to a fair trial and due process of law. Defense counsel moved for a mistrial on this ground, but the trial court stated that the prosecutor's questioning was permissible impeachment. The Michigan Court of Appeals affirmed the trial court's ruling and determined that the prosecutor did not impair Petitioner's ability to obtain a fair trial.  The Court of Appeals also stated that any error with regard to the use of Petitioner's post-arrest silence was harmless.

**1.  Clearly Established Federal Law**

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that, prior to custodial interrogation, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  In *Doyle v. Ohio*, 426 U.S. 610 (1976), "the Supreme Court held that, because the *Miranda* warnings contain an implicit assurance that 'silence will carry no penalty,' it would be

12

fundamentally unfair to allow a prosecutor to use a defendant's post-*Miranda* warnings silence to impeach the explanation he offered at trial." *Franklin v. Bradshaw,* 545 F.3d 409, 415 (6th Cir. 2008).

### 2. Application

Before Petitioner testified, the prosecutor asked several prosecution witnesses whether Petitioner had mentioned to them that the victim had threatened or attacked him and that he had acted in self defense. The prosecutor addressed this question to the 911 dispatcher for the Fraser Department of Public Safety (Tr. Nov. 10, 2005, at 103-04), to Detective Eric Myers, who responded to the crime scene (*id.* at 113, 138), to Sergeant Pettyes, who overheard Petitioner talking to himself in the booking room, (*id.* at 82-83), and to the physician who treated Petitioner's injured ear. (Tr. Nov. 16, 2005, at 38). The prosecutor subsequently asked Petitioner whether he had failed to explain his version of the facts to people after the shooting. (Tr. Nov. 16, 2005, at 90-97.) In his closing arguments, the prosecutor also emphasized the fact that Petitioner did not tell people whom he encountered after the shooting that Randy Jordan had attacked him with a knife. The prosecutor argued that a reasonable person would have mentioned the stabbing and that Petitioner did not mention his version of the facts prior to trial because it was not true. The prosecutor stated that Petitioner could have told at least five people that he had acted in self defense. (Tr. Nov. 17, 2005, at 33, 44, 75, 77.)

### a. Pre-*Miranda* Warnings Silence

The United States Court of Appeals for the Sixth Circuit explained in *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009), that

13

The Fifth Amendment guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." The Fifth Amendment's right to silence applies to a defendant in a state court proceeding under the Fourteenth Amendment. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). In general, a defendant's decision to remain silent cannot be used as substantive evidence of guilt. *Id.* This rule clearly applies to a defendant's silence after the defendant actually invokes the right to remain silent. *See id.*; *cf. Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (precluding the use for impeachment purposes of a defendant's post-Miranda silence). However, as a panel of this court recently observed, "The constitutionality of using a defendant's pre- Miranda silence as substantive evidence of guilt [has] not been addressed by the Supreme Court." *Jones v. Trombley*, 307 Fed. Appx. 931, 933 (6th Cir. 2009) (unpublished).

Petitioner was not formally advised of his *Miranda* rights before he was interrogated at the police station about 6:00 a.m. on February 6, 2005. Therefore, the state court's conclusion – that the prosecutor's conduct did not deprive Petitioner of a fair trial – was not contrary to Supreme Court precedent insofar as the state court's ruling was directed at the prosecutor's questions and comments regarding Petitioner's pre-*Miranda* warnings silence. This would include questions and comments about Petitioner's failure to assert a claim of self-defense when he talked to the 911 operator, Detective Myers, and Sergeant Pettyes.

The prosecutor also did not violate Petitioner's constitutional rights by cross-examining him regarding his pre-*Miranda* warnings silence. "[A] defendant's pre-*Miranda* silence can be used to impeach his credibility as a witness." *Id.* (citing *Portuondo v. Agard*, 529 U.S. 61, 69 (2000)). "Moreover, a prosecutor can refer to a defendant's silence if doing so would be a fair reply to a defense theory or argument . . . ." *Id.* at 233. The prosecutor's questions to Petitioner about his pre-*Miranda* warnings silence were a fair response to Petitioner's testimony and theory that he shot Randy

14

Jordan in self defense.  For all these reasons, the Court finds that the prosecutor's questions and comments regarding Petitioner's pre-*Miranda* warnings silence were proper.

### b. Post-*Miranda* Warnings Silence; Harmless Error

"[I]t is 'fundamentally unfair' to allow a prosecutor to use a defendant's post-Miranda warnings silence to impeach an explanation he offers at trial."  *Jaradat v. Williams*, 591 F.3d 863, 867 (6th Cir. 2010) (citing *Franklin v. Bradshaw*, 545 F.3d at 415, and *Doyle v. Ohio*, 426 U.S. at 618).  Consequently, the prosecutor's questions and arguments regarding Petitioner's silence during the custodial interrogation and during the subsequent examination by Dr. Mattingly were improper under *Doyle* and violated Petitioner's right to due process.  The remaining question is whether the *Doyle* error was harmless error, because "[i]mproper remarks by a prosecutor about a defendant's right to remain silent do not constitute a structural error requiring automatic reversal."  *Hall v. Vasbinder*, 563 F.3d at 235 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 629, 638 (1993)).

> Harmless error review requires the court to assess whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict."  *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2325, 168 L.Ed.2d 16 (2007), *reh'g denied*, _U.S. _, 128 S.Ct. 19, 168 L. Ed. 2d 795 (2007).  If [the Court is] in "grave doubt" whether the error had such an effect," that error is not harmless."  *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed.2d 947 (1995).  "Grave doubt" means "that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  *Id.* at 435.

*Franklin v. Bradshaw,* 545 F.3d at 415.  "'Inquiry cannot merely be whether there was enough to support the result, apart from the phase affected by the error,' but instead

'whether the error had substantial influence.'  The analysis should result from 'examination of the proceedings in their entirety.'"  *Jaradat v. Williams*, 591 F.3d at 869 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 762 (1946)).

Petitioner did not deny shooting and killing Randy Jordan, and there was inadequate evidence supporting his testimony that he acted in self defense.   The pathologist and the defense expert witness opined that Jordan was shot first in the back.  This evidence suggested that Jordan was not confronting Petitioner or posing a serious threat to him at the time of the shooting.

There was additional evidence that Petitioner had no defensive wounds on his hands.  His blood was not found at the crime scene, and he had just a few red specks on his clothing.  The knife in evidence was found folded in Jordan's pocket and there was no blood on it.  These facts further undermined Petitioner's self-defense theory. The trial court, moreover, instructed the jury that Petitioner had a constitutional right to remain silent when the police interviewed him and that the jurors were not permitted to use Petitioner's silence as proof that Petitioner committed the charged crimes.  (Tr. Nov. 17, 2005, at 87.)

The jury's verdict in all likelihood was based on the lack of a credible defense theory, as opposed to the prosecutor's questions and comments about Petitioner's post-*Miranda* warnings silence.  The Court therefore does not have a grave doubt about whether the *Doyle* error had a substantial influence on the jury's verdict.  The state court's finding of harmless error was objectively reasonable, and Petitioner has no right to relief on the basis of his *Doyle* claim.

### C.  The Alleged Suppression of Evidence

16

Petitioner alleges next that the prosecutor violated his constitutional rights to due process and to present a defense by suppressing or losing potentially exculpatory evidence. The evidence in question consisted of the shirt that Petitioner was wearing at the time of the crime and a bloody towel found at the crime scene. According to Petitioner, testing on his clothing and towel would have revealed his blood on the items and that evidence would have supported his testimony that Randy Jordan cut him and that he used the towel to wipe his ear.

The Michigan Court of Appeals reviewed this claim on the merits and concluded that Petitioner was not denied due process by the withholding of test results on Petitioner's shirt and towel. The Court of Appeals stated that there was no proof that the prosecution suppressed the evidence and that any error ultimately was harmless.

The Supreme Court explained in *Brady v. Maryland*, 373 U.S. 83 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

The articles at issue in this case were never tested to determine the source of the blood on them. Therefore, Petitioner has not satisfied the first element of a *Brady* claim – that the items were exculpatory or that they could have been used as impeachment evidence. He also has failed to show that he was prejudiced by the alleged suppression

17

of evidence.  If the items in question had been tested and the results of the tests revealed the presence of Randy Jordan's blood on the items, Petitioner's theory that Jordan stabbed him and caused his ear to bleed would have been less plausible.  The parties, moreover, stipulated at trial that the blood on Petitioner's clothing was his own blood.  (Tr. Nov. 9, 2005, at 28; Nov. 10, 2005, at 19-20, 165.)  The state court correctly concluded that Petitioner failed to satisfy all the elements of a *Brady* claim.

Petitioner faults the prosecution for losing the evidence, but to prevail on a claim that the State failed to preserve evidence that could have been subjected to tests, which might have exonerated the defendant, a defendant has to show that the prosecution acted in bad faith.  *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).  "When the government is negligent, or even grossly negligent, in failing to preserve potentially exculpatory evidence, bad faith is not established."  *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002).

The record indicates that the trial court ordered testing on Petitioner's clothing and blood-stained towel and that no testing was done on the items as of the date of trial. (Tr. Nov. 9, 2005, at 3-15.)  The lack of testing could have been the result of negligence or an inability to complete the work before trial.  Petitioner has failed to show that the police acted in bad faith.  Therefore, his right to due process was not violated, and he is not entitled to habeas relief on the basis of his claim that the prosecutor suppressed, lost, or destroyed evidence favorable to the defense.

### D.  The Trial Court's Alleged Abuse of Discretion

Petitioner alleges that the trial court abused its discretion and deprived him of a fair and impartial jury by not questioning a juror who revealed during trial that he or she

18

knew the victim's sister.  The Michigan Court of Appeals rejected this claim on the basis

that Petitioner had not shown that the juror was biased, that the juror could have been

properly excused for cause, or that Petitioner was prejudiced by the juror's presence.

### 1.  Clearly Established Federal Law

"The Sixth Amendment secures to criminal defendants the right to trial by an

impartial jury."  *Skilling v. United States*, __ U.S. __, 130 S.Ct. 2896, 2912 -13 (2010);

*accord Ristaino v. Ross,* 424 U.S. 589, 595 n. 6 (1976); *Irvin v. Dowd,* 366 U.S. 717,

722 (1961); *Mahdi v. Bagley,* 522 F.3d 631, 636 (6th Cir. 2008), *cert. denied,* __ U.S.

__, 129 S. Ct. 1986 (2009).  "[T]he seating of any juror who should have been

dismissed for cause . . . require[s] reversal."  *United States v. Martinez-Salazar*, 528

U.S. 304, 316 (2000) (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).

Due process, however, "does not require a new trial every time a juror has been

placed in a potentially compromising situation. . . .   Due process means a jury capable

and willing to decide the case solely on the evidence before it, and a trial judge ever

watchful to prevent prejudicial occurrences and to determine the effect of such

occurrences when they happen."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "[T]he

remedy for allegations of juror partiality is a hearing in which the defendant has the

opportunity to prove actual bias."  *Id.* at 215 (citing *Remmer v. United States*, 347 U.S.

227 (1954)).  "[T]he burden rests upon the defendant to demonstrate prejudice."  *Phillips*

*v. Bradshaw*, 607 F.3d at 223 (citing *United States v. Zelinka*, 862 F.2d 92, 95 (6th

Cir.1988)).

### 2.  Application

The first witness in this case was Randy Jordan's sister, Michelle Tague.  Ms.

19

Tague identified a picture of her deceased brother and stated that her brother "was a great guy." She also testified that she learned of her brother's death when a police officer came to her mother's home. After Ms. Tague was excused, an unidentified juror stated that he or she believed she knew "this young lady."[1] The trial court responded, "[A]ll right. There's not much we can do about that at this point in time." (Tr. Nov. 10, 2005, at 33-34.) The court then administered the oath to Randy Jordan's mother, Barbara Jordan, who provided a few details about her son, when she last saw him, and when she learned of his death.

The trial court should have asked the unidentified juror about his or her acquaintance with the witness and whether the juror could be fair and impartial despite being acquainted with the witness. However, even if the trial court's failure to make the proper inquiry resulted in constitutional error, Ms. Tague did not offer any significant testimony. Defense counsel did not even cross-examine her, and neither attorney objected to having the juror remain on the jury. Furthermore, It is unclear from the record whether the juror even deliberated Petitioner's case, because he or she is not identified in the record by name, gender, or juror number.

Petitioner failed to develop the facts in state court, and he has not demonstrated to this Court that he was prejudiced by the unidentified juror's presence on his jury. Therefore, he has no right to habeas relief on his claim that the trial court abused its discretion and deprived him of a fair and impartial jury.

---

[1] It is not clear from the record whether the juror was referring to Ms. Tague or to the next witness, Barbara Jordan, who was Randy Jordan's mother. Because Petitioner was present and alleges that the juror was referring to Ms. Tague, the Court will assume that the juror was, in fact, referring to Ms. Tague and not Ms. Jordan.

20

### E.  Trial Counsel

Petitioner claims that his trial attorney provided constitutionally ineffective assistance.  Specifically, Petitioner claims that his attorney should have:  (1) objected to the prosecutor's remarks about Petitioner's post-arrest silence; (2) requested a hearing on the loss or destruction of exculpatory evidence and asked for a jury instruction that the evidence would have been favorable to the defense; (3) requested a hearing on whether a juror who knew the victim's sister was biased; (4) obtained telephone records to substantiate Petitioner's testimony that he was told to place the gun in its case and to put the shells on the table; (5) introduced evidence of Petitioner's peaceful character; and (6) introduced evidence that a police officer advised Petitioner not to say anything on the ride to the police station.  The Michigan Court of Appeals determined that Petitioner was not deprived of the effective assistance of counsel.

#### 1.  Clearly Established Federal Law

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  To establish deficient performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.

To demonstrate that counsel's performance prejudiced the defense, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations omitted).

### 2. The Prosecutor's Conduct and the Allegedly Biased Juror

Petitioner maintains that defense counsel should have objected to the prosecutor's remarks about Petitioner's post-arrest silence and should have requested hearings on the loss or destruction of exculpatory evidence and on the juror who knew the victim's sister. Counsel did object to the prosecutor's remarks about Petitioner's silence. He also objected before and during trial to the State's failure to perform blood tests on Petitioner's clothing and towel. Thus, those claims about defense counsel fail. The claim about counsel not requesting a hearing on the juror who knew Randy Jordan's sister lacks merit, because the juror was not definite about whether he or she knew the witness, and the witness was insignificant.

### 3. Telephone Records; the Gun and Shells; Petitioner's Character

Petitioner alleges that his attorney was ineffective for failing to obtain telephone records to substantiate Petitioner's testimony that an official told him to place the gun in its case and the shells on the table. Petitioner also alleges that his attorney should have introduced evidence that an officer advised Petitioner not to say anything during the ride to the police station.

Petitioner testified that he was told to place the gun in its case and to put the

22

shells on the table.  He also testified that he was advised not to say anything on his ride

to the police department.  Defense counsel was not ineffective for failing to introduce

cumulative evidence.  *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006).

As for defense counsel's failure to introduce evidence of Petitioner's peaceful

character, the allegedly deficient performance likely did not prejudice the defense,

because a police officer testified that Petitioner said, "I'll kill once and I'll kill again."

Petitioner also was heard saying that he killed somebody and that he shot the victim

again and again.  In light of these comments and the lack of a credible defense theory,

there is not a reasonable probability that testimony about Petitioner's peaceful character

would have led to a different outcome in the trial.

Petitioner has failed to show that his trial attorney's performance was deficient

and that the allegedly deficient performance prejudiced the defense.  Therefore, the

state appellate court's rejection of Petitioner's ineffective-assistance-of-counsel claim

was not contrary to, or an unreasonable application of, *Strickland*.

## IV.  Conclusion

The state court's adjudications of Petitioner's claims did not result in a decision

that was contrary to Supreme Court precedent, an unreasonable application of

Supreme Court precedent, or an unreasonable determination of the facts.

Accordingly, it is **ORDERED** that the amended petition for a writ of habeas

corpus [dkt. #8] is **DENIED**.

## V.  Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no

23

automatic right to appeal a district court's denial or dismissal of the petition.  Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "[A] claim can be debatable even though every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that [the] petitioner will not prevail."  *Miller-El v. Cockrell*, 537 U.S. at 338.

Reasonable jurists could debate the Court's assessment of Petitioner's claims about the sufficiency of the evidence and the prosecutor's questions and comments on Petitioner's post-*Miranda* warnings silence.  Therefore, a certificate of appealability may issue on those claims, and Petitioner may proceed *in forma pauperis* on appeal.  The Court declines to issue a certificate of appealability on the remaining habeas claims, because those claims do not warrant encouragement to proceed further and reasonable jurists would not find the Court's assessment of the claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. at 483-84.

s/John Corbett O'Meara
United States District Judge

Date:  April 20, 2011

24

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, April 20, 2011, using the ECF system, and upon Petitioner at Newberry Correctional Facility, 3001 Newberry Avenue, Newberry, MI 49868.

s/William Barkholz
Case Manager